Argued June 25, reversed and remanded with instructions September 21, petition for rehearing denied October 14, petition for review denied November 23, 1971

IN THE MATTER OF THE ESTATE OF WINIFRED B. CLARK, DECEASED.

NEASE, *Respondent, v.* WILSON, *Defendant,* CLARK, *Appellant.*

488 P2d 1396

*Richard Bryson,* Eugene, argued the cause for appellant. With him on the briefs were Bryson & Robert, Eugene.

*Graham Walker,* Portland, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and FOLEY and THORNTON, Judges.

THORNTON, J.

This is an appeal from a decree invalidating a second codicil to the will of Winifred B. Clark and declaring that the decedent's property passed pursuant to her previous will and codicil.

The questions presented are whether the decedent had testamentary capacity to make the codicil and whether this codicil was the product of undue influence.

Decedent's will, executed December 2, 1959, and the first codicil, executed May 21, 1962, provided that her estate would be divided equally between her son, Jerome, and her daughter, Gwen, unless one of them predeceased her, in which case the survivor would take the entire estate. The second codicil, executed August 7, 1967, provided that if a son or daughter predeceased the testatrix, his or her share would go to the respective spouse.

Decedent was 94 years old at the time of her death in June 1968. She had been gradually failing physically over a period of years, was legally blind, and had been in a Portland nursing home since 1963. The firm of Lind, Somers & Collins, Inc., handled the decedent's investments. Mrs. Lillian Newman was directly in charge of decedent's account and had dealt with her in this regard for 20 years. A personal friendship also grew out of this relationship. Mrs. Newman's immediate superior in the firm was Herman Lind. The attorney for the decedent over an extended period of time was Thomas Greene, also now deceased. Mr. Greene drafted decedent's will, as well as the two codicils. Mr. Greene and Mrs. Newman witnessed all three of the instruments.

After Mrs. Clark entered the nursing home, Jerome Clark gradually assumed the responsibility of

looking after her business affairs. They both wrote checks on a joint account between 1964 and 1966. Jerome was informed in July 1967 that he had cancer. He called his mother and asked her to change her will. He called Mr. Lind and asked him to have Mr. Greene and Mrs. Newman see his mother concerning the change. Mr. Greene drew up the codicil and he and Mrs. Newman took it to the nursing home where it was signed by Mrs. Clark. Mrs. Newman and Mr. Greene signed as subscribing witnesses. Jerome died on September 25, 1967.

After Mrs. Clark's death, the daughter, Gwen, filed suit contesting the second codicil, alleging mental incapacity and undue influence. The trial court found that the contestant had carried the burden of proof on these issues and declared the second codicil null and void.

The first question to be decided is whether the testatrix had testamentary capacity at the time she executed the second codicil.

■■ The proponent has the burden to prove the testamentary competency of the testatrix. *Re Phillips' Will,* 107 Or 612, 213 P 627 (1923) ; *Vsetecka v. Novak,* 4 Or App 463, 478 P2d 655, Sup Ct *review denied* (1971). Here the execution of the codicil was in due form. In such cases the proponent is entitled to the presumption that the testatrix was competent. *Martin v. U. S. National Bank,* 1 Or App 260, 457 P2d 662 (1969), Sup Ct *review denied* (1970).

■ The sole surviving subscribing witness to the second codicil, Mrs. Newman, testified that at the time the codicil was signed the testatrix was coherent, neat and physically in control of her body. She further testified that she had observed no deterioration in the

mental condition of testatrix, that the codicil had been read to the testatrix, and that the testatrix said she understood, discussed and approved it. Testimony of a subscribing witness which bears on mental competence is entitled to great weight. *Martin v. U. S. National Bank,* supra, 1 Or App at 266.

██ Mental competency is to be determined as of the time the codicil was signed. *Kastner v. Husband,* 231 Or 133, 372 P2d 520 (1962). However, testimony of persons who had contacts with testatrix at other times is admissible, although its probative value diminishes as it becomes further removed from the date of execution. Mrs. Lancaster, a registered nurse, testified that she saw testatrix approximately once a week during the month the codicil was executed. Mrs. Lancaster said:

"She seemed fairly normal most of the time; able to carry on a conversation with her. She talked to you and made sense. Once in a while she would be confused or forgetful, but not too often.

"* * * * *

"* * * I thought she was a rather sharp, interesting ninety-four year old person."

Father Stipe, a Catholic priest, who was a friend of the family and relative of appellant, visited testatrix during the month the codicil was signed and found her coherent and rational.

██ Mr. Donnelly, an attorney of 30 years' practice, visited testatrix in February 1968, six months after the codicil was executed. He testified that testatrix was alert, intelligent, and able to discuss mutual friends of hers and Mrs. Newman intelligently, as well as the business at hand.

Mr. Ralph Band, who had visited the testatrix the

summer she executed the will, testified that he was able to discuss family affairs and current events with her and that she had done a remarkable job of keeping up her appearance.

Respondent called Frederick R. Laird, a long-time close friend of decedent and her family. Mr. Laird and his wife had visited decedent periodically in the rest home. He testified that decedent was in extremely poor mental condition in early 1966, and during visits in June 1967 she had improved physically but her mind had not improved.

Herman A. Dickel, M.D., a psychiatric specialist, examined the decedent once, for approximately an hour, five and one-half months after the codicil was executed. He testified that in his medical opinion:

> "* * * I felt at ninety-four she had what we call a chronic brain syndrome due largely to senile changes, and that from a legal point of view I felt that she was incompetent and mentally unable to take care of herself * * *."

He also stated that in his medical opinion the condition would have been substantially the same on August 7, 1967, when the codicil was executed. On cross-examination he stated that this opinion was speculative. The testimony of Dr. Dickel, as well as the attorney, Mr. Donnelly, was so far removed from the crucial date on which the codicil was executed, that it is of little value. *Martin v. U. S. National Bank,* supra, 1 Or App at 265.

■ Although there is conflicting evidence as to the competency of the testatrix, we find the proponents have established by a preponderance of the evidence that testatrix was competent.

The second question is whether the codicil of August 7, 1967, was the product of undue influence by Jerome.

■ The law will not permit improper influences to control the disposition of a person's property. *In re Reddaway's Estate,* 214 Or 410, 418, 329 P2d 886 (1958). In approaching questions of undue influence we must ask ourselves,

> "* * * [H]as the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper? * * *" 214 Or at 419.

■ The burden of proof as to undue influence is upon the contestant. *In re Estate of Verd Hill,* 198 Or 307, 334, 256 P2d 735 (1953); *Nelson v. O'Connor,* 3 Or App 215, 220, 473 P2d 161 (1970). However, where a confidential relationship exists between the testator and a beneficiary,[①] along with other suspicious circumstances, the burden of production is placed upon the proponent, *In re Reddaway's Estate,* supra, 214 Or at 420, although the burden of proof never shifts from the contestant, *In re Lobb's Will,* 173 Or 414, 432, 145 P2d 808 (1944).

The parties agree that Jerome was a fiduciary as to his mother and that a confidential relationship existed between them.

We turn now to the circumstances surrounding the execution of the codicil and Jerome's activities therein. We first examine the opportunities which he

---

[①] Where the activity questioned is that of a close relative or agent of the beneficiary, the activity is imputed to the beneficiary. Cline v. Larson, 234 Or 384, 423, 383 P2d 74 (1963); In re Estate of Porter, 192 Or 483, 515, 235 P2d 894 (1951); Annotation, 13 ALR3d 381.

had to influence his mother. During the period when it is alleged that undue influence was exerted, Jerome was too ill to travel to Portland to visit his mother. The only contact between them was a single phone call made by Jerome after he discovered that he had cancer. He telephoned his mother from Eugene and asked her to change her will to provide that his wife would take his share of her estate in the event that he predeceased his mother. He also telephoned Herman Lind and asked him to have Mr. Greene prepare a codicil to that effect, and to ask Mr. Greene and Mrs. Newman to go to the nursing home and see if his mother would be willing to make the change.

The contestant alleges that Mr. Greene and Mrs. Newman were acting in advancement of Jerome's interest, rather than the interest of Mrs. Clark, and, therefore, that their conduct in the execution of the codicil should be imputed to Jerome. Mr. Greene and Mrs. Newman had, for decades, been associated with Mrs. Clark both as friends and professional advisers. It is unquestioned that up to the present instance their conduct had been consistent with the advancement of Mrs. Clark's interests. However, the contestant asserts that a letter sent by Mr. Greene to Jerome contains language from which an inference may be drawn that Mr. Greene and Mrs. Newman were acting for Jerome in furtherance of a scheme to foist Jerome's wishes upon his mother.[2]

---

[2] The pertinent part of the letter reads:

"After talking it over with you via long distance phone a couple of times, Mr. Lind then discussed it further with Mrs. Newman, and he and I then conferred by phone and set up a plan of action. We agreed that it would be inappropriate for a full delegation to call upon your mother and that only Mrs. Newman and I would go out there, she, because she had been

■ We do not feel that the language of the letter supports the inference which the contestant asks us to make. The past relationship between Mrs. Clark, Mr. Greene and Mrs. Newman, the lack of any past connection between them and Jerome other than in the conduct of the mother's business, and the absence of any motive for them to act in Jerome's interest effectively rebuts any possible inference from the letter.

■ It is undisputed that the second codicil resulted from Jerome's request to his mother. However, reasonable solicitations, without more, do not constitute undue influence. *In re Estate of Verd Hill,* supra, 198 Or at 337. Impropriety with regard to Jerome's conduct is alleged in that he did not tell his mother he had cancer. We are unable to condemn this omission in view of the fragile state of his mother's health. She knew he was ill and must have suspected that Jerome thought it was a fatal illness. Otherwise, there would have been no purpose for his request, as it would be highly unlikely that he would predecease his mother in the normal course of events.

■ We have reviewed the facts in light of the tests set forth in *In re Reddaway's Estate,* supra, 214 Or at 419-27, in accordance with our duty to consider the matter *de novo.* Although by necessity will contests must generally be decided on circumstantial evidence, we cannot accept mere suspicion and innuendo in lieu of substantial evidence. *In re Estate of Verd Hill,*

out to see your mother at the Home from time to time and apparently enjoyed her full confidence, and I, because I would have prepared the codicil to your mother's will and would oversee its execution. We also decided that it would be inadvisable to broach both matters to your mother at one time, since the matter of a power of attorney to Mr. Lind and I (to act only jointly and together) to handle your mother's affairs, sign checks, etc., could well wait a later occasion."

supra, 198 Or at 338; *Trombly et al. v. McKenney, Ex., et al.*, 191 Or 90, 112, 228 P2d 417 (1953).

We are of the opinion that there has not been sufficient evidence of suspicious circumstances introduced to warrant a shift in the burden of going forward with the evidence to the proponent. However, it is irrelevant in this instance since we find that the weight of the evidence establishes that the influence exerted here arose from the gratitude and affection which the testatrix had demonstrated for her son and not from improper motives. This gratitude and affection were the product of mutual devotion between mother and son, and deserve to be commended rather than condemned. It is well settled that:

> "Influence arising from gratitude, affection, or esteem is not undue, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed, and shows that the disposition which he attempted to make of his property therein results from the fraud, imposition, and restraint of the person whose superior will prompts the execution of the testament in the particular manner which the testator adopts * * *." In re Darst's Will, 34 Or 58, 65, 54 P 947 (1898).

It follows that the decree must be reversed and the cause remanded with instructions to admit the codicil of August 7, 1967, to probate.

Reversed and remanded with instructions.