Argued and submitted June 9,
reversed and remanded August 18, 1980

In the Matter of the Estate of
Lena L. Unger, Deceased.
HURD et al,
*Appellants,*
*v.*
MOSBY,
*Respondent.*

(No. 129 465, CA 14840)

615 P2d 1115

James R. Cartwright, Portland, argued the cause
and and filed the briefs for appellants.

Paul S. Hybertsen, Portland, argued the cause and filed the brief for respondent.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

ROBERTS, J.

**ROBERTS, J.**

The issue on appeal in this will contest case is whether testatrix, Lena L. Unger, had sufficient testamentary capacity to execute a last will and testament on February 25, 1976. This was tried as a suit in equity and our review is de novo. Former ORS 113.055(4).[1] The probate court found that testatrix had sufficient testamentary capacity. We disagree.

The requirements of testamentary capacity were summarized in *Kastner v. Husband,* 231 Or 133, 136, 372 P2d 520 (1962), as follows:

"* * * (1) the person must be able to understand the nature of the act in which he is engaged; (2) know the nature and extent of his property; (3) know, without prompting, the claims, if any, of those who are, should or might be, the natural objects of his bounty; and (4) be cognizant of the scope and reach of the provisions of the document. If the foregoing conditions are found to prevail at the time of executing the instrument, the testator is deemed to have sufficient capacity to make a will. * * *"

*See also Hunt v. Galton,* 37 Or App 811, 815, 588 P2d 125 (1978), *rev den* (1979); *Re Phillips' Will,* 107 Or 612, 618, 213 P 627 (1923); *In Re Walther's Estate,* 177 Or 382, 386, 163 P2d 285 (1945); *In Re Estate of Verd Hill,* 198 Or 307, 317, 256 P2d 735 (1953).

The facts surrounding the actual signing of the will are as follows. Lena L. Unger executed her last will and testament, revoking her previous will, on February 25, 1976, at the age of 78. Respondent, testatrix's nephew and the beneficiary under the will, contacted an attorney to prepare the will.[2] The will was prepared from information supplied to the

---

[1] Former ORS 113.055(4) provided at the time of this suit:

"(4) In the event of contest of the will or of probate thereof in solemn form, proof of any facts shall be made in the same manner as in a suit in equity."

[2] Contestants are heirs at law of testatrix, as is respondent. Testatrix had no children nor surviving spouse at the time the will was executed. In

attorney by respondent. Testatrix never discussed the provisions of this will with the attorney at any time. Respondent picked up testatrix at a nursing home, which she had moved into eight days before, and took her to the attorney's office. The attorney testified testatrix was asked if she declared this to be her last will and testament and if she was willing to sign it. Testatrix's only comment to the attorney was the response, "yes," and an affirmative nod of her head. Testatrix signed the will at the place indicated to her by the attorney.[3]

The attorney was one of the subscribing witnesses. He testified that he felt testatrix was competent to make the will as he had no data to indicate otherwise. The other subscribing witness, the attorney's secretary, also testified that, in her opinion, testatrix was competent, as she, too, had no reason to believe otherwise. The secretary was present when respondent read aloud the provisions of the will to testatrix in the reception area, but was unable to hear anything said by testatrix although testatrix appeared to the secretary to be asking questions. After respondent's explanation to testatrix and prior to testatrix's execution of the will, testatrix approached the secretary, asking something to the effect of "What is this, what am I doing, what do you want me to do?" The

---

testatrix's prior will, executed in 1968, respondent was not a named beneficiary. In her new will, testatrix left everything to her sister and in the event of her sister predeceasing testatrix, then to respondent, Richard Mosby, her nephew. At the time this final will was executed, testatrix's sister was alive but she predeceased testatrix, and respondent became testatrix's sole beneficiary under testatrix's new will.

[3] The only previous contact the attorney had with testatrix was three years prior to the date of the will's execution. This contact was also extremely brief. Subsequent to the execution, the attorney made contact with testatrix when three weeks later the attorney prepared conservatorship papers. At that time, the testatrix was barely responsive and the attorney was not sure that she recognized him. Testatrix asked no questions but she indicated verbally that she would sign and appeared to understand who Richard Mosby, her nephew, was.

secretary did not recall that an explanation was given to testatrix by anyone. The secretary testified that the attorney then appeared and asked some cursory questions about testatrix's satisfaction with the document. The secretary did not hear testatrix say anything, but she did appear to nod her head. Testatrix then signed the document at the place indicated to her.

■ The testimony of the subscribing witnesses, aided by the presumption of competency which accompanies a will that has been duly executed, carries great weight in the determination of decedent's testamentary capacity. *Hunt v. Galton, supra,* 37 Or App at 815; *Clauder v. Morser,* 204 Or 378, 386, 282 P2d 352 (1955); *Kastner v. Husband, supra,* 231 Or at 140. The reason for this is that the determination of testamentary capacity must focus on the moment the will is executed and subscribing witnesses are in a position to observe the decedent at the time of the execution. *Gentry v. Briggs,* 32 Or App 45, 49, 573 P2d 322 *rev den* (1978); *Clauder v. Morser, supra,* 204 Or at 387; *Trombly et al. v. McKenney, Ex., et al.,* 191 Or 90, 107, 228 P2d 417 (1951). Nevertheless, this heavy reliance on the subscribing witnesses' testimony is not always appropriate.

Based on the facts and circumstances peculiar to this case, we conclude that other testimony must be given greater weight than that of the subscribing witnesses, whose exchange with testatrix was minimal and who were afforded little opportunity to observe testatrix.

■ The only other witness who was present at the time the will was executed was respondent, who indicated in his testimony that, in his opinion, testatrix had testamentary capacity. Respondent testified that he read the will to testatrix and explained everything. He could not recollect testatrix asking him any questions. He recalls testatrix's statement to secretary as "Where do I sign?" Respondent is not a disinterested witness. Therefore, his testimony is not of the category generally given great weight. *Clauder v. Morser, supra.*

[955]

■     Other witnesses who testified were nursing home personnel who had observed testatrix for a period of eight days prior to the signing of the will, and the physician who examined testatrix three days prior to the date the will was executed. These witnesses were disinterested and unanimous in their opinion that at the time the will was executed, testatrix was without testamentary capacity. Those on the nursing staff who were familiar with testatrix until her death, two and one-half years later, also indicated that at no time was she competent.

The examining physician, who is a specialist in atherosclerosis, and who had extensive experience in his practice with strokes, brain tumors and other ailments that affect the level of consciousness and mental status, diagnosed testatrix as suffering from atherosclerosis, which was manifesting itself in a brain syndrome. He indicated this mental disorder caused testatrix, at the time of the examination, to be incapable of orienting herself as to time or place and left her without a short term memory and with a very poor long term memory. Testatrix, although able to respond on a fairly basic level, had difficulty with communications such as "Lift your right leg" and "Sit on the bed." Based on his examination, the physician indicated that testatrix was confused, and that the condition would not improve, although it could fluctuate "a little" day to day. The doctor indicated that, in his opinion, testatrix could not understand she was executing a will, could not understand the import of the distribution provisions of the will, and could not understand the nature and extent of her property.

Those individuals who testified that they observed testatrix frequently both prior to and subsequent to the execution of the will were a registered nurse, a licensed practical nurse, the nursing home's activities director, and the home's administrator. They all indicated that testatrix lacked testamentary capacity. Testatrix was described as being very confused; as

wandering aimlessly about the nursing home; as being unable to distinguish her room or her possessions from other patients; as being unable to recognize the staff; as being unable to carry on a conversation; and as being able to communicate only on the most basic level and only if a short answer was required. Testimony indicated that her mental confusion left her unable to dress herself appropriately and caused her to have difficulty feeding herself and maintaining personal hygiene.

Contrary testimony was given by respondent's daughters, who indicated that testatrix recognized respondent and family members and that discussions between respondent and testatrix were understandable during this period of time.[4] The testimony, however, suggests passivity and almost monosyllabic responses by testatrix.

Respondent's wife indicated that approximately eight days prior to the will's execution testatrix picked out night clothes while shopping, could communicate clearly, and continued to be able to do so well after the will was executed, except when she was heavily sedated. The testimony does not show with any specificity what participation testatrix actually manifested or what her communication was except that testatrix communicated her desire to leave the nursing home. Respondent's wife testified that testatrix consistently recognized family members. There was testimony by respondent that testatrix signed checks after he prepared them and discussed the bills with him during this time.

One other witness, an old friend of testatrix, testified that testatrix recognized her when she had telephoned the nursing home within one month after the will's execution and that she and testatrix visited by phone. This witness also described a conversation

---

[4] Respondent's daughters were named beneficiaries under testatrix's prior will and would have taken under that will if testatrix's sister predeceased her.

with testatrix which took place approximately one month prior to the will's execution. In that conversation testatrix was an active participant, discussing recent past events and also reminiscing.

We conclude the evidence of testatrix's mental acuity is not as persuasive as the testimony from the examining physician and the nursing home personnel, the examining physician, who were disinterested and who were dealing with testatrix on a more constant basis than the other witnesses during the period of time surrounding the date of the will's execution.

Reversed and remanded.